UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
NATURAL RESOURCES DEFENSE COUNCIL,
INC., et al.,

           :  11 Civ. 3562(THK)

       Plaintiffs,  :

           :

     -against-     :  **MEMORANDUM**

           :  **OPINION AND ORDER**

UNITED STATES FOOD AND DRUG   :
ADMINISTRATION, et al.,     :

           :

       Defendants.  :

           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

On March 22, 2012, this Court granted summary judgment to Plaintiffs Natural Resources Defense Council, Inc. ("NRDC"), Center for Science in the Public Interest ("CSPI"), Food Animal Concerns Trust ("FACT"), Public Citizen, and Union of Concerned Scientists, Inc. ("UCS"), (collectively "Plaintiffs") on their first claim for relief. See Natural Res. Def. Council v. United States Food & Drug Admin. ("NRDC I"), No. 11 Civ. 3562 (THK), 2012 WL 983544, at *20 (S.D.N.Y. Mar. 22, 2012). The Court determined that Defendants United States Food and Drug Administration ("FDA" or "Agency"), Margaret Hamburg, in her official capacity as Commissioner of the FDA, the Center for Veterinary Medicine ("CVM"), Bernadette Dunham, in her official capacity as Director of the CVM, United States Department of Health and Human Services ("HHS"), and Kathleen

1

Sebelius, in her official capacity as Secretary of HHS, unlawfully withheld agency action by failing to implement withdrawal proceedings pursuant to the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360b(e), for certain uses of penicillin, oxytetracycline, and chlortetracycline in food-producing animals. See id. Presently before the Court are the parties' cross-motions for summary judgment on Plaintiffs' third claim for relief, which alleges that the FDA acted in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the FDCA, 12 U.S.C. § 360b(e), when it denied two Citizen Petitions requesting that the FDA withdraw approval of certain uses of certain classes of antibiotics in food-producing animals.  The parties have consented to trial before this Court, pursuant to 28 U.S.C. § 636(c).  For the reasons that follow, Plaintiffs' motion is granted and Defendants' motion is denied.

BACKGROUND[1]

I.   Statutory and Regulatory Background

    A.   The Food, Drug, and Cosmetic Act

    The FDCA empowers the FDA to regulate drugs sold in interstate

---

[1] The Court assumes familiarity with the history of antibiotic use in food-producing animals, as it was discussed extensively in the March 22, 2012 decision.  Accordingly, only the facts necessary for the disposition of the current dispute will be discussed.

commerce, including veterinary drugs.  See 21 U.S.C. § 393(b).  In
conjunction with this authority, the FDA is required to "promote
the public health" and to ensure that "human and veterinary drugs
are safe and effective."  21 U.S.C. § 393(b)(1)-(2).  Specifically,
pursuant to the FDCA, the FDA must approve the use or intended use
of any "new animal drug"[2] and the labeling thereof.  See 21 U.S.C.
§ 360b(a)(1).  Any person may submit a new animal drug application
("NADA") to the FDA for approval of the use or intended use of a
new animal drug; the application must include sufficient evidence
of the drug's safety and efficacy, including "full reports of
investigations which have been made to show whether or not such
drug is safe and effective for use[.]"  21 U.S.C. § 360b(b)(1)(A).[3]
In general, the FDA will approve a NADA unless the agency finds
that the drug use has not been shown to be safe or effective.  See
12 U.S.C. § 360b(d)(1); 21 C.F.R. § 514.1(b)(8)(i).

Once the FDA has approved the use of a new animal drug, the
applicant holder must make periodic reports to the Agency
describing experience with the drug and any new research into the
drug's safety and effectiveness.  See 21 C.F.R. § 514.80(a)(2).

_____

[2] A new animal drug is defined, in part, as "any drug
intended for use for animals other than man, including any drug
intended for use in animal feed but not including such animal
feed . . . ."  See 21 U.S.C. § 321(v).

[3] Any person may file an abbreviated new animal drug
application ("ANADA") for approval of a generic animal drug.

The FDA reviews these periodic reports to determine whether approval of the drug use should be suspended or withdrawn pursuant to 21 U.S.C. § 360b(e). See 21 C.F.R. § 514.80(a)(3). Section 360b(e)(1) requires the FDA to withdraw approval of a new animal drug if it finds that, based on new evidence, the "drug is not shown to be safe . . . ." See 21 U.S.C. § 360b(e)(1)(B).[4] The FDA must provide notice of an opportunity for a hearing ("NOOH") to a drug applicant prior to issuing a withdrawal order. See 21 U.S.C. § 360b(e)(1).

B.   Regulation of Antibiotics in Food-Producing Animals

In the 1950s, the FDA approved applications for the use of various antibiotics in food-producing animals for a variety of non-disease treatment purposes, including growth promotion, feed efficiency, and disease prevention. For these uses, antibiotics were approved to be administered on a herd- or flock-wide basis at doses lower than those traditionally used to treat disease. When the Agency first approved these uses of antibiotics, little was known about the development of antibiotic-resistant bacteria or the role of agricultural use of antibiotics in the development of resistant bacteria.

---

[4]   Section 360b(e)(1) lists six findings by the Agency that prompt withdrawal.   See 21 U.S.C. § 360b(e)(1)(A)-(F).   The most relevant findings for the present action are those described in subsection (B).

4

However, by the late 1960s scientific evidence had emerged linking the widespread use of antibiotics in food-producing animals at low doses with the development of antibiotic-resistant bacteria. In 1970, the FDA convened a task force to study the risks associated with the use of antibiotics in animal feed. The task force was composed of scientists from the FDA, the National Institutes of Health, the U.S. Department of Agriculture, the Centers for Disease Control, as well as representatives from universities and industry. In 1972, the task force published its findings, concluding that: (1) the use of antibiotics in animal feed, especially at doses lower than those necessary to prevent or treat disease, favors the development of antibiotic-resistant bacteria; (2) animals receiving antibiotics in their feed may serve as a reservoir of antibiotic pathogens, which can produce human infections; (3) the prevalence of bacteria carrying transferrable resistant genes for multiple antibiotics had increased in animals, and the increase was related to the use of antibiotics; (4) antibiotic-resistant bacteria had been found on meat and meat products; and (5) the prevalence of antibiotic resistant bacteria in humans had increased. See Antibiotic and Sulfonamide Drugs in Animal Feeds, 37 Fed. Reg. 2,444, 2,444-45 (Feb. 1, 1972). The task force made several recommendations, including that (1) antibiotics used in human medicine be prohibited from use in animal

5

feed unless they met safety criteria established by the FDA, and (2) several specific antibiotics be reserved for therapeutic use unless they met safety criteria for non-therapeutic use.  See id. at 2,445.

In response to the findings of the task force, the FDA, in 1973, issued a regulation providing that the Agency would propose to withdraw approval of all subtherapeutic uses of antibiotics in animal feed unless drug sponsors and other interested parties submitted data within the next two years "which resolve[d] conclusively the issues concerning [the drugs'] safety to man and animals . . . under specific criteria" established by the FDA. Antibiotic and Sulfonamide Drugs in the Feed of Animals, 38 Fed. Reg. 9,811, 9,813 (Apr. 20, 1973) (codified at former 21 C.F.R. § 135.109; renumbered at 21 C.F.R. § 558.15).  One of the most important of the human and animal health safety criteria that the FDA established for drug safety evaluations involved the transfer of antibiotic resistant bacteria from animals to humans.  The FDA required that "[a]n antibacterial drug fed at subtherapeutic levels to animals must be shown not to promote increased resistance to antibacterials used in human medicine."  Penicillin-Containing Premixes Notice ("Penicillin Notice"), 42 Fed. Reg. 43,772, 43,774 (Aug. 30, 1977).  The other health safety criteria involved showing that use of antibiotics would not increase salmonella in animals,

6

would not increase the pathogenicity of bacteria, and would not increase residues in food ingested by man, which may cause "increased numbers of pathogenic bacteria or an increase in the resistence of pathogens to antibacterial agents used in human medicine." See id.

Over the next two years, the Bureau of Veterinary Medicine ("BVM"),[5] a subdivision of the FDA, reviewed the data submitted by drug sponsors to support the subtherapeutic use of antibiotics. By April 20, 1975, all data concerning the safety and efficacy criteria for antibiotic drugs had been received. See id. at 43,774. The FDA took no immediate action after receiving the data other than, in 1977, issuing notices proposing to withdraw approval of all subtherapeutic uses of penicillin in livestock, see Penicillin Notice, 42 Fed. Reg. at 43,772, and, with limited exceptions, all subtherapeutic uses of oxytetracycline and chlortetracycline in livestock. See Tetracycline (Chlortetracycline and Oxytetracycline)-Containing Premises; Opportunity for Hearing ("Tetracycline Notice"), 42 Fed. Reg. 56,264, 56,264 (Oct. 21, 1977). Although the notices were properly promulgated and over twenty drug sponsors requested hearings on the matter, the FDA never held hearings or took any further action on

_____

[5] The BVM was renamed the Center for Veterinary Medicine ("CVM") in 1984.

7

the proposed withdrawals.[6]

Since 1977, the evidence of the risks to human health posed by antibiotic-resistant bacteria and the link between low-dose antibiotic use and the development of resistant-bacteria has grown. Nevertheless, with limited exceptions, the FDA has not withdrawn approval of the subtherapeutic use of antibiotics in food-producing animals.[7] Instead, the FDA has issued several non-binding guidance documents for industry to promote the judicious use of antibiotics.[8]

_____

[6] The FDA's failure to complete the withdrawal proceedings for penicillin, chlortetracycline, and oxytetracycline was the subject of Plaintiffs' first claim for relief. On March 22, 2012, this Court ordered the Agency to complete these withdrawal proceedings. See NRDC I, 2012 WL 983544, at *20.

[7] For example, in 2005, the Agency withdrew approval of the use of enrofloxacin, an antimicrobial drug within a class of drugs known as fluoroquinolones, in poultry. See Enroloxacin for Poultry; Final Decision on Withdrawal of New Animal Drug Application Following Formal Public Evidentiary Hearing; Availability, 70 Fed. Reg. 44,105, 44,105 (Aug. 1, 2005).

[8] Specifically, in 2003, the FDA released Guidance for Industry # 152, which established a risk assessment to evaluate the risks posed by the subtherapeutic use of antibiotics in food-producing animals. (See Administrative Record ("Rec.") at 131.) The risk assessment was intended to be utilized by drug sponsors in the application process, and thus had no effect on already approved NADAs/ANADAs.  In 2010, the FDA released Draft Guidance for Industry # 209 ("Draft Guidance # 209"), which established non-binding principles for the judicious use of antibiotics in food-producing animals. (See id. at 167.)  Specifically, Guidance # 209 recommended that "[t]he use of medically important antimicrobial drugs in food-producing animals should be limited to those uses that are considered necessary for assuring animal health[,]" and "to those uses that include veterinary oversight

II.   The Citizen Petitions

The issue presently before the Court involves the FDA's response to two Citizen Petitions, filed in 1999 and 2005, respectively.   Both Petitions requested that the FDA begin withdrawal proceedings for all non-therapeutic uses of medically-important antibiotics in food-producing animals.

A.   The 1999 Citizen Petition

On March 9, 1999, four of the named Plaintiffs, CSPI, FACT, Public Citizen, and UCS, as well as the Environmental Defense Fund, submitted a Citizen Petition ("1999 Petition") to the FDA requesting that the agency "rescind approvals for subtherapeutic uses in livestock of any antibiotic used in (or related to those used in) human medicine." (See Administrative Record ("Rec.", at 4-5.)   The 1999 Petition defined "subtherapeutic use" as the "administration of [antibiotics] at a dosage less than is necessary and/or for a period of time longer than is necessary to treat an infection", (id. at 8), including use of such drugs for "growth promotion, improved feed efficiency, and disease prevention."[9]

_____

or consultation." (Id. at 182-83.)   Draft Guidance # 209 was finalized on April 13, 2012. (See Ex. A to the Declaration of Amy A. Barcelo, dated Apr. 16, 2012 ("Third Barcelo Decl.").)

[9] The 1999 Petition explained that "[t]he FDA defines subtherapeutic use as the use of antibiotics in livestock for more than 14 days." (Rec. at 8.)

(Id. at 5.)  Although the 1999 Petition sought broad withdrawal of all subtherapeutic uses of antibiotics that are also used in humans, it named several specific classes of antibiotics for which it sought withdrawal, including penicillin, tetracyclines, erythromycin, lincomycin, tylosin, and virginiamycin.  (See id. at 5.)

The bulk of the 1999 Petition was devoted to a discussion of the scientific evidence indicating that the subtherapeutic use of antibiotics in food-producing animals poses a risk to human health. Citing numerous peer-reviewed studies,[10] the 1999 Petition discussed the widespread subtherapeutic use of antibiotics in livestock; the evidence that such use leads to the selection of antibiotic resistance; the evidence that antibiotic-resistant bacteria can be transferred between animals and between animals and people; the evidence that antibiotic-resistant bacteria may transfer resistant genes to other bacteria; the evidence that the subtherapeutic use of antibiotics may select for multi-drug-resistant bacteria that can cause infections that are more deadly and difficult to treat; the evidence that nontherapeutic antibiotic use jeopardizes the therapeutic options in veterinary and human medicine; the evidence that the subtherapeutic use of antibiotics reduces the

---

[10] The 1999 Petition cites over twenty articles from leading science and microbiology journals.

effectiveness of new human-use antibiotics; and evidence, from other countries, that decreasing the subtherapeutic use of antibiotics in food-producing animals can reduce the prevalence of antibiotic-resistant bacteria and does not adversely affect animal health.

    1.   <u>FDA's Response to the 1999 Petition</u>

The FDA issued a tentative response to the 1999 Petition on August 19, 1999. (<u>See</u> Rec. at 50.) The FDA stated that it "is currently considering the issues raised in [the] citizen petition . . . ." (<u>See</u> <u>id.</u>) However, "[b]ecause of the complex nature of the action requested [in the citizen petition], which requires careful and thorough scientific, legal, and policy consultation, analysis and coordination wthin the agency, FDA will require additional time to issue a final response to [the] citizen petition." (<u>See</u> <u>id.</u>) Specifically, the FDA stated that it would issue a final response after completing an "analysis of the comments received on [the] citizen petition, the framework document, numerous consultations and the resolution of the scientific, legal and policy issues." (<u>See</u> <u>id.</u>)

The FDA issued a second tentative response on February 28, 2001. (<u>See</u> <u>id.</u> at 51.) The FDA explained the process for withdrawing approval of a new animal drug, emphasizing that "the petitions can only be granted or denied on a drug by drug basis as

11

reviews are completed and resources permit." (<u>Id.</u> at 52.)  The FDA described the findings necessary to trigger a withdrawal and the regulatory requirements for holding a hearing prior to withdrawing approval of a NADA/ANADA.  The FDA explained that its "experience with contested, formal withdrawal proceedings is that the process can consume extensive periods of time and Agency resources." (<u>Id.</u> at 52.)  The FDA discussed its other strategies for addressing antibiotic use in food-producing animals, including Guidance for Industry # 78, "which addresses how FDA intends to consider the potential human health impact of the microbial effects associated with all uses of antimicrobial new animal drugs in food-producing animals when approving such drugs," and a "framework document" establishing a risk-based framework for evaluating the microbial safety of the use of antimicrobial drugs in food-producing animals. (<u>See</u> <u>id.</u> at 53.)  The FDA again stated that it could not issue a final decision until it had completed an analysis of the "comments received on [the] citizen petition, the Framework Document, numerous consultations, and the resolution of the scientific, legal, and policy issues." (<u>Id.</u> at 54.)

     2.   <u>FDA's Final Response to the 1999 Petition</u>

The FDA issued its final response to the 1999 Petition, denying the requested action, on November 7, 2011, during the pendency of this action.  The FDA recounted the history of its

12

handling of the 1999 Petition, including its earlier statements
that it would not issue a final decision until the "FDA makes a
decision about whether to withdraw the drug approvals listed in the
petition." (See id. at 71.) The FDA explained that it was unclear
from the 1999 Petition whether the action requested was to
immediately issue a withdrawal order or to initiate withdrawal
proceedings, and the Agency proceeded to discuss and deny both
actions. (See id. at 72.) The FDA explained that it could not
issue a withdrawal order for the drugs included in the 1999
Petition "[b]ecause no [withdrawal] hearings have been held with
respect to the animal drugs at issue in the Citizen Petition, and
. . . the Commissioner has not made any final determination about
whether grounds for withdrawal under [21 U.S.C. § 360b(e)] have
been satisfied . . . ." (Id. at 73.)

Moreover, the FDA refused to initiate withdrawal proceedings.
The FDA offered two justifications for this decision. First, the
FDA cited the time and expense involved in holding a withdrawal
hearing. (See id. at 73.) Second, the FDA explained that it was
pursuing a different strategy to promote the judicious use of
antibiotics in food-producing animals. (See id.) Specifically,
the FDA cited Draft Guidance # 209, entitled "The Judicious Use of
Medically Important Antimicrobial Drugs in Food-Producing Animals,"
which recommends limiting the use of antibiotics in food-producing

13

animals to judicious uses. (See id.) Draft Guidance # 209 states that the FDA does not consider growth promotion or feed efficiency to be judicious uses. (See id.) Draft Guidance # 209 also recommends that the use of medically-important antibiotics in food-producing animals should be limited to "uses that include veterinary oversight or consultation." (See id. at 74.) The FDA explained that "[b]ased on feedback [the FDA] has received [regarding Draft Guidance # 209], FDA believes that the animal pharmaceutical industry is generally responsive to the prospect of working cooperatively with the Agency to implement the principles recommended in [the Draft Guidance]." (Id.) The FDA stated that it planned to phase-out over-the-counter use of medically-important antibiotics in animal feed and move to a veterinary feed directive ("VFD") status for such drugs. The FDA also stated that it planned to work cooperatively with industry to achieve this transition. (See id.) "FDA believes that the strategy set out in draft guidance #209 is a pathway to achieving the same goals as those advocated in [the 1999 Petition] . . . ." (Id.) Accordingly, the FDA refused to initiate withdrawal proceedings for the drugs included in the 1999 Petition.

> B.   The 2005 Citizen Petition

On April 7, 2005, named Plaintiff UCS, as well as the Environmental Defense Fund, the American Academy of Pediatrics, and

14

the American Public Health Association, filed a Citizen Petition ("2005 Petition") with the FDA "to withdraw approvals for herdwide/flockwide uses of [certain antibiotics][11] in chicken, swine, and beef cattle for purposes of growth promotion (including weight gain and feed efficiency) and disease prevention and control (except for non-routine use where a bacterial infection has been diagnosed within a herd or flock)[.]" (Id. at 75.) The 2005 Petition did not seek "withdrawal of disease prevention or disease control uses where a drug is administered to individual animals, or to select groups or pens of animals, or where a drug is administered in response to a diagnosed outbreak of bacterial disease within a building, house, or feedlot." (Id. at 76.)

The 2005 Petition emphasized that its requested action, withdrawal of approval of certain uses of certain medically-important antibiotics, was designed in accordance with the FDA's Guidance for Industry # 152 ("Guidance #152"). This Guidance, issued on October 23, 2003, established criteria for evaluating the safety of agricultural antibiotics with regards to antibiotic resistance when considering new animal drug applications. (See id.

---

[11] The 2005 Petition applied to penicillins, tetracyclines, aminoglyosides, streptogramins, macrolides, lincomycin, and sulfonamides. (Rec. at 75.)

at 76.)[12]

Similar to the 1999 Petition, the 2005 Petition presented a comprehensive scientific basis for its requested action.  First, the 2005 Petition explained the background of antibiotic resistance and the agricultural use of antibiotics.  (See id. at 77-80.)  The 2005 Petition then discussed the development of Guidance # 152 and the legal standard for the FDA to withdraw approval of a new animal drug application.  (See id. at 80-83.)  The 2005 Petition then presented scientific evidence that the approved uses of antibiotics covered in the Petition are not consistent with the safety criteria

---

[12] Guidance # 152, entitled "Evaluating the Safety of Antimicrobial New Animal Drugs with Regard to Their Microbiological Effects on Bacteria of Human Health Concern[,]" provides a "risk assessment approach for evaluating the microbial food safety of antimicrobial new animal drugs."  (Rec. at 133.) The risk assessment provided in Guidance # 152 presented a means for drug applicants to demonstrate that new animal drugs meet the human health safety requirement in the NADA approval process. (See Rec. at 133.)  Specifically, the risk assessment involved characterizing the hazard and then providing: (1) a release assessment - the probability that resistant bacteria are present in the target animal as a consequence of drug use (ranked as high, medium, or low); (2) an exposure assessment - the probability for humans to ingest bacteria in question from the relevant food commodity (ranked as high, medium, or low); and (3) a consequence assessment - the probability that human exposure to resistant bacteria results in an adverse health consequence (ranked as important, highly important, or critically important). (See id. at 137.)  These assessments are used to provide an overall risk assessment, which is ranked as high, medium, or low. (See id.) The risk assessment provided in Guidance # 152 was only a suggestion, not a requirement, and only applicable to new animal drug applications.

in Guidance # 152.  (See id. at 83-89.)  The 2005 Petition explained that, pursuant to Guidance # 152, only low-risk antibiotic drugs should be administered to food-producing animals on a flock-wide or herd-wide basis. (See id. at 84-85.) Using the criteria set forth in Guidance # 152, the 2005 Petition demonstrated that the antibiotics covered by the Petition are not low-risk based on their release, exposure, and consequence. (See id. at 85-89.)  Moreover, use of the antibiotics covered in the 2005 Petition in chicken, swine, or beef cattle results in a high- or medium-risk.  (See id. at 89.)  The 2005 Petition concluded by repeating its request that FDA begin withdrawal proceedings for herd-wide and flock-wide uses of critically important and highly important antibiotics in chicken, swine, and beef cattle. (See id. at 89.)

     1.  FDA's Initial Response to the 2005 Petition

The FDA provided a tentative response to the 2005 Petition on October 4, 2005. (See Rec. at 124.)  The response summarized the action requested — withdrawal of medically-important antibiotics based on the criteria presented in Guidance # 152 — and explained that to withdraw approval of a new animal drug required the completion of two processes.  (See id.)  First, the CVM must determine whether to initiate formal withdrawal proceedings. (See id.)  Second, if the CVM decides to initiate formal withdrawal

17

proceedings, the Agency must then undertake the formal withdrawal procedures required by statute, including providing notice and an opportunity of a hearing to the drug sponsor. (See id.) The response stated:

> For legal, scientific and resource reasons, withdrawal actions for the petitioned drugs need to be considered on a drug by drug basis. Data and information will need to be reviewed and analyzed for each drug. Thus, the petitions can only be granted or denied on a drug by drug basis as reviews are completed and resources permit.

(Id.)

The FDA then explained that to initiate formal withdrawal proceedings one of the grounds listed in § 360b(e)(1) must be satisfied. (See id.) The FDA detailed the administrative process required to withdraw approval of a new animal drug, including issuing a notice for each drug, providing an opportunity for a formal evidentiary hearing, and the right to appeal the decision made by a hearing officer. (See id. at 125.) The FDA noted that formal withdrawal proceedings may take years to complete and may consume extensive agency resources. (See id.) The FDA then explained its current approach to regulating antibiotics in animal feed, as presented in Guidance # 152. The FDA concluded by stating that "the petition can only be granted or denied when the Agency makes a final decision on whether to withdraw any of the drug

18

approvals listed in your petition."

      2.    <u>FDA's Final Response to the 2005 Petition</u>

On November 7, 2011, during the pendency of this litigation, the FDA issued a final response to the 2005 Petition. (<u>See</u> <u>id.</u> at 127.) The FDA stated that "[a]lthough we share [petitioners'] concern about the use of medically important antimicrobial drugs in food-producing animals for growth promotion and feed efficiency indications (i.e., production uses), . . . FDA is denying your petition." (<u>Id.</u>) The FDA explained that the CVM's decision whether or not to initiate formal withdrawal proceedings for a new animal drug is "primarily an internal process, although participation by drug sponsors and the public may be requested." (<u>Id.</u> at 128.)

The FDA then explained that for "various reasons the Agency has decided not to institute formal withdrawal proceedings at this time and instead is currently pursuing other alternatives to address the issue of antimicrobial resistance related to the production use of antimicrobials in animal agriculture." (<u>Id.</u>) The FDA's decision was based, in part, on "[t]he Agency's experience with contested, formal withdrawal proceedings [which] can consume extensive periods of time and Agency resources." (<u>Id.</u> at 128-29.) The FDA continued:

19

> Recognizing that the process of reviewing safety information for antimicrobial drugs approved before 2003, and pursuing withdrawal proceedings in some cases, would take many years and would impose significant resource demands on the Agency, in June 2010, FDA proposed a different strategy to promote the judicious use of medically important antimicrobials in food-producing animals in [Draft Guidance # 209] . . . .

(Id. at 129.)   The FDA then explained the substance of Draft Guidance # 209 and the FDA's "belie[f] that the animal pharmaceutical industry is generally responsive to the prospect of working cooperatively with the Agency to implement the principles recommended in [Draft Guidance # 209]."   (Id.)   The FDA concluded:

> FDA believes that the strategy set out in [Draft Guidance # 209] is a pathway to achieving the same goals as those advocated by [petitioners], i.e., judicious use of medically-important antimicrobials. Additionally, given the considerable amount of Agency resources that are required to pursue withdrawal proceedings, we believe the current proposed approach will accomplish these goals in a more timely and resource-efficient manner than would otherwise be the case. Moreover, this strategy does not foreclose initiating withdrawal proceedings in the future."

(Id. at 130.)

### C.   Subsequent Agency Action

On April 13, 2012, the FDA released the finalized Guidance for Industry # 209, "The Judicious Use of Medically Important Antimicrobial Drugs in Food Producing Animals." (See Ex. A to the

20

Declaration of Amy A. Barcelo, dated Apr. 16, 2012 ("Apr. 16
Barcelo Decl.") at 1.)  As with the Draft Guidance for Industry #
209, the final guidance provided "a framework for the voluntary
adoption of practices to ensure the appropriate or judicious use of
medically important antimicrobial drugs in food-producing animals."
(See id. at 3.)  The framework includes "phasing in such measures
as (1) limiting medically important antimicrobial drugs to uses in
food-producing animals that are considered necessary for assuring
animal health; and (2) limiting such drugs to uses in food-
producing animals that include veterinary oversight or
consultation."    (Id.)    Guidance # 209 acknowledged that
"[a]ntimicrobial resistance, and the resulting failure of
antimicrobial therapies in humans is a mounting public health
problem of global significance[,]" and that "[t]his phenomenon is
driven by many factors including the use of antimicrobial drugs in
. . . animals."  (Id. at 4.)  The Guidance contained a thorough
review of the most seminal reports and peer-reviewed scientific
literature on the issue of antimicrobial resistance. (See id. at
5-17.)

On April 13, 2012, the FDA released Draft Guidance for
Industry # 213, entitled "New Animal Drugs and New Animal Drug
Combination Products Administered in or on Medicated Feed or
Drinking Water of Food-Producing Animals: Recommendations for Drug

21

Sponsors for Voluntarily Aligning Product Use Conditions with [Guidance] # 209." (See Ex. C to the Apr. 16 Barcelo Decl. at 2.) Draft Guidance # 213 contains information for the relevant drug sponsors "to facilitate voluntary changes to the conditions of use . . . consistent with FDA's recommendations included in [Guidance # 209]."[13]  (Id.)  The FDA explained that it

> recognize[d] the significance of the proposed changes and the potential impacts such changes will have on the animal pharmaceutical industry, animal producers, the animal feed industry and the veterinary profession.  For this reason, FDA is currently pursuing a strategy for the voluntary adoption of these changes in an effort to minimize the impacts and provide for an orderly transition.

(Id. at 7.)  The Agency requested that affected drug sponsors that intended to make the voluntary changes inform the Agency within three months of the publication of the final version of Guidance # 213.[14]  (See id.)  The "FDA anticipates that sponsors of the affected products should be able to complete implementation of the

---

[13] Draft Guidance # 213 outlines several methods for drug sponsors to voluntarily comply with Guidance # 209.  A drug sponsor of an affected drug may submit a supplemental new drug application that proposes to change the marketing status of the drug to veterinary feed directive or prescription and voluntarily withdraw the approval for all production uses.  (See id. at 8.) Such a supplemental application would not require additional evidence of safety or efficacy, and in most cases the drug sponsor would only be required to submit revised labeling.

[14] It is unknown when, if ever, the final version of Draft Guidance # 213 will be published.

changes discussed in this draft guidance within 3 years from the date of publication of the final version of this guidance." (Id.)

III. The Present Action

Plaintiffs instituted the present action, on May 25, 2011, prior to the FDA's issuance of a final response to either the 1999 Petition or the 2005 Petition. In the Complaint, Plaintiffs claimed that the FDA's failure to issue a final response to the Citizen Petitions constituted an agency action unreasonably delayed in violation of the APA and the FDA's implementing regulations. (See Compl. ¶ 98.) Plaintiffs filed an Amended Complaint on July 7, 2011, but the claim regarding the FDA's failure to respond to the Petitions remained the same. (See Amended Compl. ("Am. Compl.") ¶ 101.) Plaintiffs filed a motion for summary judgment on all claims on October 6, 2011. As discussed above, the FDA provided final responses to both the 1999 Petition and the 2005 Petition on November 7, 2011. (See Rec. at 71, 127.) Consequently, on January 6, 2012, Plaintiffs withdrew their claim regarding the FDA's failure to respond to the Petitions as moot.

However, on January 31, 2012, this Court granted Plaintiffs leave to file a supplemental complaint, which Plaintiffs filed on February 1, 2012. The Supplemental Complaint added an additional claim for relief ("third claim for relief"), alleging that the FDA's final responses denying the 1999 and 2005 Citizen Petitions

were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the [FDCA], 21 U.S.C. § 360b, and the APA, 5 U.S.C. § 706(2)." (Supplemental Compl. ¶ 38.)

Presently before the Court are the parties' cross-motions for summary judgment on Plaintiffs' third claim for relief.

DISCUSSION

I.  Legal Standard

A.  Summary Judgment

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Patterson v. Cnty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98 (2d Cir. 2003). The burden of demonstrating the absence of any genuine dispute as to a material fact rests upon the party seeking summary judgment, see Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970), but once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d

24

Cir. 2003) (citing <u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. at 2552). Where, as here, a court considers cross-motions for summary judgment, the court applies the same legal principles and "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." <u>Make the Road by Walking, Inc. v. Turner</u>, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted).

Here, the parties do not dispute the essential facts. The only issue before the Court is the legal conclusion resulting from those facts.

### B. <u>Subject Matter Jurisdiction</u>

Defendants argue that this Court lacks subject matter jurisdiction over the FDA's denial of the 1999 and 2005 Citizen Petitions. Specifically, Defendants contend that the FDA's denial of the Petitions was an action "committed to agency discretion by law" and thus outside the scope of judicial review pursuant to the APA. 5 U.S.C. § 701(a)(2).

### 1. <u>Legal Standard</u>

Under FDA regulations, the denial of a citizen petition is a final agency action subject to judicial review. <u>See</u> 21 C.F.R. § 10.45(d). The Administrate Procedure Act ("APA"), therefore, governs judicial review of the denial of the Petitions. <u>See</u> 5 U.S.C. §§ 701-06. Although the APA embodies a "basic presumption

of judicial review," Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57, 113 S. Ct. 2485, 2495 (1993), by its terms, the APA does not apply if an "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to judicial review is "very narrow" and "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe ("Overton Park"), 401 U.S. 402, 410, 91 S. Ct. 814, 820-21 (1971) (internal quotation marks and citations omitted); accord Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002). Accordingly, judicial review is precluded "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830, 105 S. Ct. 1649, 1655 (1985); accord Drake, 291 F.3d at 70 ("If no such judicially manageable standards are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts.") (internal quotation marks and citations omitted). In such cases, "the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." Drake, 291 F.3d at 70.

"In determining whether a matter has been committed solely to agency discretion, [a court] must consider both the nature of the

26

administrative action at issue and the language and structure of
the statute that supplies the applicable legal standards for
reviewing that action." Drake, 291 F.3d at 70 (internal citation
omitted). Enforcement actions are presumptively committed to
agency discretion by law and are therefore outside the bounds of
judicial review. See Chaney, 470 U.S. at 832, 105 S. Ct. at 1656
("[A]n agency's decision not to take enforcement action should be
presumed immune from judicial review under [5 U.S.C.] §
701(a)(2)."). However, this presumption of unreviewability "may be
rebutted where the substantive law has provided guidelines for the
agency to follow in exercising its enforcement powers[,]" or where
"the agency has consciously and expressly adopted a general policy
that is so extreme as to amount to an abdication of its statutory
responsibilities." Id. at 833 & 833 n. 4, 105 S. Ct. at 1656 &
1656 n. 4 (internal quotation marks and citations omitted); accord
Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1257 (D.C. Cir.
2005).

    2.  Application

        a.  Enforcement Action

Although Defendants claim that the decision to institute
formal withdrawal proceedings is an enforcement decision, the Court
disagrees. First, the provisions of the FDCA at issue in the
present case are the substantive regulatory provisions. See 21

U.S.C. § 360b.   In <u>Chaney</u>, which also involved the FDCA, the provisions at issue were enforcement provisions.   There, the Supreme Court rejected a challenge to the FDA's denial of a citizen petition requesting that the Agency take a number of enforcement actions, including seizing drugs, adding warning labels to the drugs, and prosecuting all individuals in the chain of distribution who knowingly distributed the drugs for the use in question. <u>Chaney</u>, 470 U.S. at 824, 105 S. Ct. at 1651-52.   These actions are authorized pursuant to provisions contained within Subchapter III of the FDCA, which is entitled "Prohibited Acts and Penalties" and governs enforcement proceedings.[15]   In contrast, here, the action requested by Plaintiffs — withdrawal of approval — would be taken pursuant to a provision contained in Subchapter V of the FDCA, which is entitled "Drugs and Devices" and governs the regulation of human and veterinary drugs.   Because the present case involves the substantive provisions of the FDCA, which address the Agency's

---

[15] Subchapter III contains one provision relating to the withdrawal of approval of abbreviated new drug applications. <u>See</u> 21 U.S.C. § 335c(a)(1) (requiring the Secretary to "withdraw approval of an abbreviated drug application if the Secretary finds that the approval was obtained, expedited, or otherwise facilitated through bribery, payment of an illegal gratuity, or fraud or material false statement . . . ."). This provision is not at issue in the current dispute, as the Citizen Petitions requested the FDA to withdraw approval of the relevant NADAs/ANADAs, pursuant to 21 U.S.C. § 360b(e)(1)(B), on the grounds that the drugs were not shown to be safe.

affirmative obligations to ensure the safety of drugs approved by the Agency, Chaney is not controlling.

Defendants maintain that the distinction between enforcement and substance is not dispositive.  They cite several cases to support the proposition that Chaney may preclude judicial review of agency actions taken pursuant to substantive statutory provisions. See Jerome Stevens Pharm., 402 F.3d at 1258; Riverkeeper, Inc. v. Collins, 359 F.3d 156, 165-66 (2d Cir. 2004); Schering Corp. v. Heckler, 779 F.2d 683, 685 (D.C. Cir. 1985).  However, none of these cases clearly supports this proposition.  In Riverkeeper, which involved a challenge to the Nuclear Regulatory Commission's denial of a request to require additional safety measures prior to renewing a nuclear power plant's license, there was no dispute that the requested action was an enforcement action.  See Riverkeeper, 359 F.3d at 166 n. 11.[16]  Although both Riverkeeper and the action presently before the Court involve substantive statutory provisions regarding licensing, the Riverkeeper court's failure to analyze whether the action at issue qualified as enforcement renders it irrelevant.

_____

[16] The plaintiff in Riverkeeper first raised the argument that the requested action was not an enforcement action in its reply brief.  See Riverkeeper, 359 F.3d at 166 n. 11. Consequently, the court declined to review the issue and treated the action as enforcement without analysis.  See id.

The other cases cited by Defendants are similarly distinguishable from the present action. In Schering, the court declined to review a challenge to the FDA's decision to enter a settlement agreement with a drug manufacturer whereby the FDA agreed not to "initiate any enforcement litigation against [the manufacturer]" until the manufacturer had filed a citizen petition and received a decision on whether the manufacturer's product was a new animal drug. See Schering Corp., 779 F.2d at 685 (internal quotation marks and citation omitted). Schering, therefore, involved a challenge to the FDA's explicit statement that it would not enforce a possible violation of the FDCA for a set period of time, which clearly falls under the Chaney presumption of unreviewability. Lastly, in Jerome Stevens, the court determined that the FDA's decision to extend the deadline for the submission of new drug applications for a particular drug was a decision not to enforce and immune from judicial review. See Jerome Stevens, 402 F.3d at 1257-58. The court reasoned that, by extending the deadline, the FDA was announcing its intention not to bring enforcement actions against manufacturers selling the drug without an approved application. See id.

Here, however, the relationship between a withdrawal proceeding and subsequent enforcement actions is not as clear. During the pendency of a withdrawal proceeding, a drug applicant

may still manufacture and sell the drug at issue without facing any liability pursuant to the statute.   Furthermore, withdrawal proceedings will not necessarily result in the issuance of a withdrawal order, as a withdrawal order can only be issued after the drug applicant has an opportunity for an evidentiary hearing. See 21 U.S.C. § 360b(e)(1).   Consequently, the Agency's decision whether to initiate withdrawal proceedings for a particular drug in the first instance has little if any bearing on the Agency's enforcement decisions regarding that drug.

The process of withdrawing approval of a new animal drug is more analogous to informal rulemaking than to traditional enforcement actions.[17]   First, although the FDA may regulate approved drugs through regulations passed pursuant to notice and comment rulemaking, the Agency has chosen to utilize withdrawal proceedings as the primary means of formally regulating approved drugs.[18]   Second, withdrawal proceedings are undertaken as a result

_____

[17] Judicial review is readily available when a plaintiff brings suit challenging an agency's denial of a citizen petition requesting that the agency initiate informal rulemaking.   See Massachusetts v. EPA, 549 U.S. 497, 527, 127 S. Ct. 1438, 1459 (2007) ("Refusals to promulgate rules are . . . susceptible to judicial review, though such review is extremely limited and highly deferential.") (internal quotation marks and citations omitted).

[18] At oral argument, Defendants conceded that the Agency has not utilized rulemaking to regulate the use of approved drugs, other than through the publication of guidance documents for industry.   (See Transcript, dated May 10, 2012, at 22.)

31

of a finding by the FDA regarding the drug's safety or efficacy, and are not premised on the violation of any law or regulation.[19] See 21 U.S.C. § 360b(e)(1) (describing the grounds for mandatory withdrawal of approval of a new animal drug application). In contrast, enforcement proceedings are traditionally undertaken upon a finding that an entity has violated an existing regulation or law. Third, withdrawal proceedings have several legislative aspects making them more akin to traditional informal rulemaking. For example, withdrawal of approval has future effect. Once the FDA has withdrawn approval of a NADA, it prevents that drug from being sold or marketed under the FDCA, and it prevents manufacturers of generic drugs from receiving approval to market generic versions of such drugs.

In Massachusetts v. Environmental Protection Agency, the Supreme Court listed several factors that distinguish enforcement proceedings from rulemaking. See 549 U.S. 497, 527, 127 S. Ct. 1438, 1459 (2007). The Court explained:

> In contrast to nonenforcement decisions, agency refusals to initiate rulemaking are less frequent, more apt to

---

[19] Of course, withdrawal proceedings may be instituted for other reasons, including that the initial drug application contained untrue statements of material fact. See 21 U.S.C. § 360b(e)(1)(E); id. § 360b(e)(2) (explaining the grounds for which the Secretary may withdraw approval of a new animal drug application).

> involve legal as opposed to factual analysis, and subject
> to special formalities, including a public explanation.
> They moreover arise out of denials of petitions for
> rulemaking which (at least in the circumstances here) the
> affected party had an undoubted procedural right to file
> in the first instance.

Id. at 527, 127 S. Ct. at 1459 (internal quotation marks and citations omitted). Although the FDA's decision to withdraw approval of a new animal drug involves a factual analysis, that is not its exclusive basis; and, in all other aspects it is akin to a rulemaking proceeding. Withdrawal proceedings are infrequent and subject to formal proceedings. See 21 U.S.C. § 360b(e)(1) (requiring an opportunity for a public hearing prior to the issuance of a withdrawal order). Any withdrawal order must contain an explanation of the findings supporting the order. See 21 C.F.R. § 12.120. And here, as in Massachusetts v. Environmental Protection Agency, the FDA's decision not to initiate withdrawal of approval of the relevant new animal drugs was a result of the FDA's denial of a petition that the petitioners had a right to bring. See 21 C.F.R. § 10.30(b)(2) (explaining the requirements for the submission of a citizen petition and stating that a petition may request that the agency "issue, amend, or revoke an order . . .").

Finally, the FDA's own discussion of its decision on the Petitions strongly paints this action as regulatory rather than enforcement. The FDA received more than 38,000 comments on the

33

1999 Petition, and "the comments and other relevant data and information needed to be evaluated by the Agency before action would be taken." (See Rec. at 71.)   In its second tentative response to the 1999 Petition, the Agency explained that it would "issue a final response [the 1999 Petition] upon completion of [the Agency's] analysis of the comments received on [the citizen petition], the Framework Document, numerous consultations, and the resolution of the scientific, legal, and policy issues." (Rec. at 66.)   This description of the process of reviewing the Citizen Petitions closely mirrors the process of notice-and-comment rulemaking.   Furthermore, the Agency rested its denial of the Petitions, in part, on the Agency's decision to pursue a different regulatory strategy. The Agency explained that it had "proposed a different strategy to promote the judicious use of medically important antimicrobials in food-producing animals . . . ." (See Rec. at 73, 129.)   This statement suggests that the Agency considers withdrawal proceedings one regulatory strategy and the voluntary program embodied in Guidance #209 another regulatory strategy.

For all the above reasons, the Court finds that initiating the withdrawal of approval of a new animal drug is not an enforcement

34

action.[20]

      b.   <u>Law to Apply</u>

Even if the Court were to find that the withdrawal of approval of a new animal drug is an enforcement action, the FDCA provides sufficient "guidelines for the agency to follow in exercising its enforcement powers" to rebut the presumption of unreviewability. <u>See</u> <u>Chaney</u>, 470 U.S. at 833, 105 S. Ct. at 1656.

The FDA is charged with regulating drugs sold in interstate

---

[20] In any event, if the Court were to find that withdrawal of approval is an enforcement action, the FDA's denial of the Petitions announced a general Agency policy of not pursuing withdrawal proceedings for the subtherapeutic use of antibiotics in food-producing animals. Unlike a specific decision not to enforce, an agency's general policy regarding enforcement is subject to judicial review. <u>See</u> <u>Crowley Caribbean Transport, Inc. v. Pena</u>, 37 F.3d 671, 676 (D.C. Cir. 1994) ("[A]n agency's statement of a <u>general</u> <u>enforcement</u> <u>policy</u> may be reviewable for legal sufficiency where the agency has expressed the policy . . . in some form of universal policy statement.") (internal citations omitted) (emphasis in original); <u>Roane v. Holder</u>, 607 F. Supp.2d 216, 226-27 (D.D.C. 2009) (same). In <u>Crowley</u>, the court explained that general enforcement policies are subject to judicial review because they "are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings" and "will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy . . ." <u>Crowley</u>, 37 F.3d at 677. Here, the Agency's denials did not consist of a drug-by-drug analysis and decision not to enforce; rather, in the denial letters, the Agency announced a policy for the regulation of subtherapeutic use of antibiotics in food-producing animals whereby the Agency would not initiate formal withdrawal proceedings and would instead rely on a voluntary program. Such a broad statement of policy is subject to judicial review.

commerce. See 21 U.S.C. § 393(b). Pursuant to the FDCA, any new
animal drug shall be deemed unsafe and "adulterated" unless it is
subject to an approved or conditionally approved NADA/ANADA. See
21 U.S.C. § 360b(a). The FDA is required to approve a NADA/ANADA
unless it finds that grounds for non-approval exist, which include
a finding that the drug is not safe. See § 360b(c)(1) & (d)(1)(B).
Once the FDA approves a NADA/ANADA, both the FDA and the drug
applicant have continuing obligations. Drug applicants are
required to "establish and maintain indexed and complete files
containing full records of all information pertinent to safety or
effectiveness of a new animal drug that has not been previously
submitted as part of the NADA or ANADA." 21 C.F.R. § 514.80(a)(1).
Furthermore, drug applicants "must submit reports of data, studies,
and other information concerning experience with new animal drugs
to the [FDA] for each approved NADA and ANADA . . . ." Id. §
514.80(a)(2). The regulations contemplate third parties producing
data relevant to this analysis and require such third parties to
"submit data, studies, and other information concerning experience
with new animal drugs to the appropriate applicant . . . [who], in
turn, must report the nonapplicant's data, studies and other
information to the FDA." Id. The "FDA reviews the records and
reports required in [21 C.F.R. § 514.80] to facilitate a
determination under [21 U.S.C. § 360b(e)] as to whether there may

36

be grounds for suspending or withdrawing approval of the NADA or ANADA." Id. § 514.80(a)(3). Section 360b(e)(1) states that "[t]he Secretary shall, after due notice and opportunity for hearing to the applicant, issue an order withdrawing approval of [a new animal drug application] if the Secretary finds . . . that new evidence . . . shows that such drug is not shown to be safe . . . ." 21 U.S.C. § 360b(e)(1)(B).

The FDCA and accompanying regulations require the FDA, as part of its regulatory authority, to monitor and evaluate data regarding approved new animal drugs and institute withdrawal proceedings if the data shows that the drugs are no longer shown to be safe. Although § 360b(e)(1) grants the Secretary the discretion to make an initial finding whether a drug is shown to be safe or not, the substance and structure of the FDCA cabin the Secretary's discretion in making that initial decision. Specifically, 21 C.F.R. § 514.80 makes clear that in making initial decisions regarding withdrawal, the Agency is to review the scientific evidence of the drug's safety. This finding is buttressed by 21 U.S.C. § 393(b), which requires the FDA to "promptly and efficiently review[] clinical research" and ensure that "veterinary drugs are safe and effective[.]" 21 U.S.C. § 393(b)(1) & (2)(B). The Court is satisfied that § 393(b), § 360b, and the accompanying regulations, which guide the Agency's approval and continued

37

monitoring of new animal drugs, provide sufficient guidelines to allow the Court to review the action challenged in the present case.

Accordingly, the Court finds that there are standards and law to apply and that the FDA's denials of the 1999 and 2005 Citizen Petitions are subject to judicial review.[21]

C.   The Administrative Procedure Act

The APA provides that a district court may set aside an agency's findings, conclusions of law, or action only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "In reviewing agency action, [a] [c]ourt may not 'substitute its judgment for that of the agency.'"  Natural Res. Def. Council v. EPA, 658 F.3d 200, 215

---

[21] Several other courts have found that FDA decisions regarding the regulation of approved animal drugs are subject to judicial review.  See A.L. Pharma, Inc. V. Shalala, 62 F.3d 1484, 1488-89 (D.C. Cir. 1995) (reviewing the FDA's refusal to withdraw approval of a new animal drug application after the plaintiff filed a citizen petition with the FDA alleging that the relevant drug application relied on improperly obtained information and should not have been approved according to the FDA's own regulations); Barnes v. Shalala, 865 F. Supp. 550, 558 (W.D. Wisc. 1994) (holding that the FDA's decision not to require labeling of milk products containing recombinant bovine somatotropin (rbST) was subject to judicial review because the plaintiffs were not requesting "the FDA to investigate an unapproved use of [an approved drug]" and instead were asking "only that, as part of the FDA's reconsideration of the safety and effectiveness of rbST, the agency consider whether the approved use of the drug requires labeling").

(2d Cir. 2011) (quoting <u>Overton Park</u>, 401 U.S. at 416, 91 S. Ct. at 824). Nevertheless, a reviewing court's "inquiry must be searching and careful." <u>Natural Res. Def. Council, Inc. v. FAA</u>, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks and citations omitted). An agency decision may be deemed arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S., Ind. v. State Farm Mut. Auto. Ins. Co.</u> ("<u>State Farm</u>"), 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983); <u>accord</u> <u>Yale-New Haven Hosp. v. Leavitt</u>, 470 F.3d 71, 79 (2d Cir. 2006).

While this standard of review is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" <u>Natural Res. Def. Council v. Daley</u>, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting <u>A.L. Pharma, Inc. v. Shalala</u>, 62 F.3d 1484, 1491 (D.C. Cir. 1995)); <u>see also</u> <u>Islander East Pipeline Co., LLC v. McCarthy</u>, 525 F.3d 141, 151 (2d Cir. 2008) ("This is not to suggest that judicial review of agency action is merely perfunctory. To the

39

contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful.") (internal quotation marks and citations omitted). To be upheld upon judicial review, the agency must have articulated "a rational connection between the facts found and the choice made." Henley v. FDA, 77 F.3d 616, 620 (2d Cir. 1996) (quotation marks omitted).

D. Application

Here, the 1999 and 2005 Citizen Petitions requested that the FDA withdraw approval for certain uses of medically-important antibiotics in food-producing animals. The FDA issued final responses to the 1999 and 2005 Citizen Petitions on November 7, 2011, denying the actions requested. Specifically, while "shar[ing] [petitioners'] concerns about the use of medically important antimicrobial drugs in food-producing animals for growth promotion and feed efficiency indications[,]" (Tr. at 71, 127), the FDA explained that it had decided not to initiate formal withdrawal proceedings for the medically-important antibiotics implicated in the Petitions, and, instead, was pursuing a voluntary strategy to address antibiotic resistance related to the use of the antibiotics in food-producing animals. (See Rec. at 73, 129-30.) In both final responses, the Agency explained that its "experience with contested, formal withdrawal proceedings is that the process can consume extensive periods of time and Agency resources." (See id.

40

at 73, 128-29.)   The Agency continued: "Recognizing that the process of reviewing safety information for antimicrobial drugs approved before 2003, and pursuing withdrawal proceedings in some cases, would take many years and would impose significant resource demands on the Agency, in June 2010, FDA proposed a different strategy to promote the judicious use of medically important antimicrobials in food-producing animals . . . ."   (See id. at 73, 129.)   The Agency went on to describe Draft Guidance # 209, which provides non-binding industry guidance for the judicious use of medically-important antibiotics in food-producing animals.

Essentially, the Agency presented two grounds for denying the Petitions.   First, the Agency cited the time and expense required to evaluate individual drug safety and to hold formal withdrawal proceedings if necessary.   Second, the Agency emphasized that it had adopted non-binding voluntary measures to promote the judicious use of antibiotics in food-producing animals, which it believed would achieve the same result as formal withdrawal proceedings. Neither of these grounds provides a reasoned justification for the Agency's refusal to initiate withdrawal proceedings.

In responding to a citizen petition, an agency's "reasons for action or inaction must conform to the authorizing statute." Massachusetts v. EPA, 549 U.S. at 533, 127 S. Ct. at 1462.   Here, the FDCA provides that the Agency's decision whether to initiate

41

formal withdrawal proceedings must be based on an evaluation of the scientific evidence of a drug's safety.    See 21 U.S.C. § 360b(e)(1)(b).    If the evidence demonstrates that a drug is not shown to be safe, the Agency must rescind approval of that drug through formal withdrawal proceedings.    See id.; FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000) ("Viewing the FDCA as a whole, it is evident that one of the Act's core objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use.") (internal citations omitted).    The statute contains no language indicating that the costs of a withdrawal proceeding — either to the Agency itself or to industry — are to be taken into account when making the decision whether to initiate withdrawal proceedings.    Rather, in both approving an initial drug application and determining whether withdrawal is appropriate, the inquiry focuses on whether the drug is safe and effective.    See 21 U.S.C. § 360b(b)(1)(A) (requiring a new animal drug application sponsor to submit "full reports of investigations which have been made to show whether or not such drug is safe and effective for use"); id. § 360b(d)(1) (explaining grounds for the Agency to deny a NADA, including "reports . . . do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use . . ." or "the results of such tests show that such drug is

42

unsafe for use . . . or do not show that such drug is safe for use
. . ."); <u>id.</u> § 360b(e)(1)(B) (requiring the Agency to withdraw
approval of a NADA/ANADA if the Agency finds that a drug is "not
shown to be safe").

In the instant case, the Agency failed to address the
Petitions on their merits.  The Agency did not evaluate the science
presented in the Petitions or assess the safety of the relevant
drugs.  Although the Administrative Record for the 1999 and 2005
Citizen Petitions is more than three thousand pages in length and
contains numerous scientific studies of the risks of antibiotic
resistance from the use of antibiotics in food-producing animals,
the Agency did not address or even mention the scientific evidence
in its responses.   Further, in its tentative responses to the
Citizen Petitions, the Agency stated that "[f]or legal, scientific
and resource reasons, withdrawal actions for the petitioned drugs
need to be considered on a drug by drug basis.  Data and
information will need to be reviewed and analyzed for each drug.
Thus the petitions can only be granted or denied on a drug by drug
basis as reviews are completed and resources permit." (<u>See</u> Rec. at
52, 124.)  However, the Agency issued its final responses, denying
the Petitions, without presenting any evidence — in the denial
letters or in the Record — that these drug by drug analyses had
been completed or ever undertaken. There is no evidence in the

43

Record that the Agency performed any risk or safety assessments of the petitioned drugs at all.  The Agency simply refused to evaluate the drugs' safety on the grounds that if withdrawal proceedings were required they would "take many years" and "impose significant resource demands."[22]  (Id. at 73, 129.)

Denying the Petitions on the grounds that it would be too time consuming and resource-intensive to evaluate each individual drug's safety, and withdraw approval if a drug was not shown to be safe,

---

[22] By not addressing the scientific evidence, the FDA failed to adequately explain why some classes of antibiotics are subject to withdrawal proceedings and not others.  For example, in 1977, the Agency issued initial findings that penicillin and tetracycline were not shown to be safe for subtherapeutic use in food-producing animals, and, pursuant to 21 U.S.C. § 360b(e)(1), published notices of an opportunity for hearings in the Federal Register.  See Penicillin Notice, 42 Fed. Reg. at 43,774; Tetracycline Notice, 42 Fed. Reg. at 56,264.  Although these notices were still pending when the Agency denied the Petitions, the Agency did not address - in either the denial letters or the Record - why the evidence demonstrating that penicillin and tetracycline were not shown to be safe did not apply to the other classes of antibiotics implicated in the Petitions.  Similarly, in denying the 2005 Petition, the Agency failed to adequately explain why the petitioned antibiotics, which would be classified as "high risk" or "medium risk" under Guidance # 152 and therefore would not receive Agency approval if the subject of a new NADA/ANADA, were not subject to withdrawal proceedings.  The Agency fails to provide a reasoned explanation why these drugs should remain on the market, other than the time and expense involved in withdrawing approval.  While courts will defer to an agency's scientific expertise, here, the Agency has presented no explanation for its decision to treat penicillin and tetracycline differently than the other classes of antibiotics implicated in the Petitions and no reason why antibiotics that would no longer receive initial approval can nevertheless remain on the market.

is arbitrary and capricious.  The Agency did not discuss or appear to consider the controlling statute's governing criteria and overall purpose — whether the drugs at issue pose a threat to human health, if so, the obligation to withdraw approval for such health-threatening drugs.  See Massachusetts v. EPA, 549 U.S. at 535, 127 S. Ct. at 1463 (holding that an agency "must ground its reasons for action or inaction in the statute"); State Farm, 463 U.S. at 43, 103 S. Ct. at 2867 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . .").  The fact that withdrawing approval may be costly or time-consuming is not a sufficient justification, under the FDCA, for the Agency to abdicate its duty to ensure that the use of animal drugs is safe and effective.  Congress has explicitly provided the mechanism to be employed when a drug is found not to be safe.  In effect, the FDA is refusing to follow the statutory mandate of withdrawal proceedings on the ground that such proceedings are not effective because they take too long.[23]  Yet, the Petitions at issue have been pending for thirteen and seven years, respectively.  The position that instituting withdrawal proceedings — what the statute mandates

---

[23] One can only wonder what conceding the absence of an effective regulatory mechanism signals to the industry which the FDA is obligated to regulate.

45

— is too time consuming is both ironic and arbitrary.  Had the Agency addressed the Petitions in a timely fashion, withdrawal proceedings could have been commenced and completed by now.[24]

Moreover, the Agency failed to address the Citizen Petitions' request that the Agency withdraw approval of the use of medically-important antibiotics in food-producing animals for the purpose of disease prevention.  In the denial letters, the Agency stated that it shared the Petitioners' "concern about the use of medically important antimicrobial drugs in food-producing animals for growth promotion and feed efficiency indications (i.e., production uses). . . ."  (Rec. at 71, 127.)  However, the Agency made no mention of

---

[24] It is not clear why the withdrawal proceedings must be on a drug-by-drug basis, with individualized research and conclusions as to each drug.  There is no evidence that the scientific studies undertaken by various groups and government bodies draw different conclusions for different antibiotics. Indeed, the FDA appears to accept that all of the classes of antibiotics at issue pose a similar threat, as its proposed voluntary approach makes no distinction.  At most, it appears that the Agency would have to issue eleven different notices of an opportunity for a hearing for the eleven different classes of antibiotics implicated in the Petitions.  For example, in 1977, the Agency issued one notice pertaining to penicillin NADAs/ANADAs, see Penicillin Notice, 42 Fed. Reg. at 43,774, and one notice pertaining to tetracycline NADAs/ANADAs, see Tetracycline Notice, 42 Fed. Reg. at 56,264, despite the fact that each notice applied to multiple drug products.  Moreover, after receiving requests for hearings on the 1977 notices, the Agency indicated that it would hold a single public evidentiary hearing on both the proposed penicillin and tetracycline withdrawals.  See Penicillin and Tetracycline in Animal Feeds Hearing, 43 Fed. Reg. 53,827, 53,827 (Nov. 17, 1978).

the use of medically-important antibiotics for disease prevention in animals. The Agency stated that it did not consider production uses a judicious use of medically-important antibiotics and planned to phase out such uses through the voluntary guidance program. (See id. at 72-73, 129.) The voluntary guidance program also requests that other uses of medically-important antibiotics in animals, including use of antibiotics for disease prevention, be available only through a veterinary directive. (See id.) The Agency did not respond to the Petitioner's claims that the use of the indicated antibiotics for general disease prevention was not shown to be safe, and did not provide any explanation for its decision to allow the continued use of these drugs for that purpose. This failure to explain the Agency's decision-making is arbitrary and capricious.[25] See State Farm, 463 U.S. at 43, 103 S.

---

[25] The Agency did address this issue in Guidance # 209. The Agency explained:

> Some may have concerns that the use of medically important antimicrobial drugs in food-producing animals for disease prevention purposes is not an appropriate or judicious use. However, FDA believes that some indications for prevention use are necessary and judicious as long as such use includes professional veterinary involvement. . . . When determining the appropriateness of a prevention use, veterinarians consider several important factors such as determining the medical rationale for such use and that such use is appropriately targeted at a specific etiologic agent and appropriately timed relative to the disease.

47

Ct. at 2866 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal quotation marks and citations omitted).

Plaintiffs contend, with some justification, that the Agency's refusal to evaluate the science was motivated in part by a desire to avoid the statutory requirement of initiating formal withdrawal proceedings for drugs not shown to be safe.   Nevertheless, the Agency has all but made a finding that the subtherapeutic use of antibiotics in food-producing animals has not been shown to be safe.   In the course of this litigation, the Agency has conceded that "the phenomenon of antimicrobial resistance exists, [that] antimicrobial resistance poses a threat to public health, [and that] the overuse of antimicrobial drugs in food-producing animals can contribute to the development of antimicrobial resistance." (See Memorandum of Law in Support of the Government's Motion for Summary Judgment on Plaintiff's First Supplemental Complaint at 2.) The Agency has also stated that it "has reviewed the recommendations provided by . . . various published reports and, based on this review, believes the overall weight of evidence

---

(Ex. A to the Apr. 16, 2012 Barcelo Decl. at 21.)   This explanation still fails to address the science indicating that such use could pose a risk to human health.

48

available to date supports the conclusion that using medically important antimicrobial drugs for production purposes is not in the interest of protecting and promoting the public health." (See Rec. at 179.)  These statements, while not the equivalent of a finding that triggers a withdrawal proceeding under the FDCA, indicate that the Agency recognizes that these drugs pose a risk (possibly a very serious risk) to human health.  However, instead of taking the statutorily prescribed action - making a finding that the drugs are not shown to be safe and initiating withdrawal proceedings - the Agency has pursued a course of action not foreseen by Congress.

Of course, nothing prevents the Agency from seeking voluntary cooperation from the drug industry, in tandem with a notice of intent to withdraw approval.  Had it done so years ago, and achieved success, there would be no need for withdrawal proceedings now.  But in the instant case, the Agency was presented with two Citizen Petitions, seven and thirteen years ago, respectively, alerting the Agency to the human health risks associated with the subtherapeutic use of antibiotics in food-producing animals.[26]  In an eleventh hour response, the Agency pointed to a guidance program that encourages industry to use these drugs "judiciously," with no hard evidence that the drug sponsors have agreed or will agreed to

---

[26] The Agency has been aware of the science indicating a human health risk since the early 1970s.

the proposed measures.   By refusing to make findings as to the
drugs' safety — or provide a statutorily based reason for refusing
to make such findings — the Agency avoided the Congressionally
mandated scheme for addressing drugs not shown to be safe.   The
Agency may not substitute proposed voluntary measures, such as
those embodied in Guidance # 209, for the measures mandated by the
statute.   See Natural Res. Def. Council, Inc. v. EPA, 595 F. Supp.
1255, 1261 (S.D.N.Y. 1984) ("It is not an agency's prerogative to
alter a statutory scheme even if its assertion is as good or better
than the congressional one.") (internal quotation marks and
citations omitted).

Although the Agency argues that the Court should defer to its
decision to implement a voluntary program in lieu of evaluating the
safety of the drugs and initiating withdrawal proceedings if
necessary, the Court cannot defer because the statute clearly
commands a different course of action.[27]   See Chevron v. Natural

---

[27] The FDA relies on SEC v. Citigroup Global Markets, Inc.
("SEC v. Citigroup"), 673 F.3d 158, 164 (2d Cir. 2012), to
support its claim that the Court must defer to an agency's
decision to initiate or compromise adversarial proceedings.   That
case involved the SEC's decision to settle an enforcement
proceeding filed in federal court.   The court explained that
"numerous factors . . . affect a litigant's decision whether to
compromise a case or litigate it to the end[,] includ[ing] the
value of the particular proposed compromise, the perceived
likelihood of obtaining a still better settlement, the prospects
of coming out better, or worse, after a full trial, and the
resources that would need to be expended in the attempt."   Id.

Case 1:11-cv-03562-THK   Document 95   Filed 06/01/12   Page 51 of 54

Res. Defense Counicl, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778,
2781 (1984) ("If the intent of Congress is clear, that is the end
of the matter; for the court, as well as the agency, must give
effect to the unambiguously expressed intent of Congress.")
Moreover, the Agency has failed to explain the basis for its claim
that the voluntary program will more effectively achieve the same
results as formal withdrawal proceedings.  The Agency points to the
time and resources involved in holding public hearings.  However,
if any credence is to be given to the Agency's position that the
drug industry intends to comply with the voluntary program, then it
is unclear why the industry would contest formal withdrawal notices
or require time consuming hearings.  Here, the statutory scheme
requires the Agency to ensure the safety and effectiveness of all
drugs sold in interstate commerce, and, if an approved drug is not
shown to be safe or effective, the Agency must begin withdrawal

---

The court further stated that the decision to settle a lawsuit
was a "wholly discretionary matter[] of policy."  Id.  Here, as
discussed extensively in Section IIB, the FDA's decision to
initiate withdrawal proceedings is not wholly discretionary.
Unlike in SEC v. Citigroup, where there was no statutory guidance
governing the agency's decision to settle the lawsuit, the FDCA
outlines the circumstances under which the FDA may approve an
animal drug and the circumstances under which the FDA must
withdraw that approval.  Moreover, the Court fails to see how the
Court's obligation to give substantial deference to an agency
decision to settle a single lawsuit relates to the present
dispute.  The Agency's decision to forego withdrawal proceedings
for all of the petitioned antibiotics cannot be compared to an
agency's decision to settle a single lawsuit.

51

proceedings.[28]  The Agency has forsaken these obligations in the name of a proposed voluntary program, Guidance # 209, and acted contrary to the statutory language.

Accordingly, the Court finds the Agency's denial of the Petitions to be arbitrary and capricious.  For over thirty years, the Agency has been confronted with evidence of the human health risks associated with the widespread subtherapeutic use of antibiotics in food-producing animals, and, despite a statutory mandate to ensure the safety of animal drugs, the Agency has done shockingly little to address these risks.  Now, in responding to this litigation and two Petitions that have been pending for years, requesting that the Agency comply with its statutory mandate, the Agency has refused to make any findings and instead intends to adopt a voluntary program that is outside the statutory regulatory

---

[28] The FDA describes the regulatory process in Guidance # 209:

> FDA considers the issue of antimicrobial resistance as part of its human food safety review related to new animal drugs used in food-producing animals.  FDA considers an antimicrobial new animal drug to be "safe" if the agency concludes that there is "reasonable certainty of no harm to human health" from the proposed use of the drug in food-producing animals.  This standard applies to safety evaluations completed prior to new animal drug approvals, as well as to those completed for drugs after approval.  If this safety standard is not met before approval, the drug cannot be approved.  If safety issues arise after approval, the [FDCA] provides grounds for withdrawal of approval of new animal drug applications for safety reasons.

scheme.    The adoption of voluntary measures does not excuse the
Agency from its duty to review the Citizen Petitions on their
merits.     The  Agency  must  evaluate  the  safety  risks  of  the
petitioned drugs and either make a finding that the drugs are not
shown to be safe or provide a reasoned explanation as to why the
Agency is refusing to make such a finding.

    The FDA failed to offer a reasoned explanation, grounded in
the statute, for its refusal to initiate withdrawal proceedings,
and,  therefore,  its  action  was  arbitrary  and  capricious  and
otherwise not in accordance with law.    Massachusetts v. EPA, 549
U.S. at 534, 127 S. Ct. at 1463.[29]

---

[29] Defendants maintain that Massachusetts v. EPA is
inapposite because it involved an agency's complete refusal to
regulate a pollutant.  Defendants claim that the present action
is distinguishable because FDA is actively regulating the
relevant drugs - just not in the manner preferred by Plaintiffs.
The Court is not persuaded by this argument.  The Court's holding
in Massachusetts v. EPA was based on the EPA's failure "to comply
with [a] clear statutory command."  549 U.S. at 533, 127 S. Ct.
at 1462.  Similarly, the FDA has failed to comply with its
statutory command to evaluate the safety of approved drugs and to
initiate formal withdrawal proceedings if the drug is no longer
shown to be safe.  See 21 U.S.C. § 360b(e)(1).  Rather than abide
by its statutory guidelines when reviewing the Petitions, the
Agency failed to evaluate the science presented, failed to make a
finding as to the safety of the drugs and drug-uses implicated,
and failed to provide a statutorily adequate explanation of why
the Agency had declined to make a finding on the drugs' safety.
The Agency's response is thus arbitrary, capricious, and not in
accordance with law.  See Massachusetts v. EPA, 549 U.S. at 534,
127 S. Ct. at 1463 ("In short, EPA has offered no reasoned
explanation for its refusal to decide whether greenhouse gases
cause or contribute to climate change.  Its action was therefore

53

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment on their third claim for relief is granted and Defendants' motion for summary judgment is denied.   The Court remands the matter to the Agency for further proceedings consistent with this Opinion.   The Court emphasizes that it is not compelling the Agency to reach a certain conclusion.   The Court simply finds that the Agency's proffered grounds for denying the Petitions were arbitrary and capricious.

So Ordered.

_____
THEODORE H.  KATZ
UNITED STATES MAGISTRATE JUDGE


Dated: June 1, 2012
       New York, New York

_____

arbitrary, capricious, . . . or otherwise not in accordance with
law.") (internal quotation marks and citations omitted).